EXHIBIT A

LEWIS COUNTY WA
RECEIVED & FILED
SUPERIOR COURT

MAR - 9 1993

DONNA KARVIA, CLERK
BY_____

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR THE COUNTY OF LEWIS

JUVENILE DIVISION

In re the Dependency of:          )
                                  )
R██████ J. T████████              )    NO.  91-7-00109-6
DOB: ███████, 1986                )
                                  )    ORDER OF GUARDIANSHIP
          A Minor Child.          )
_____)

THIS MATTER came before the court on December 3, 1992 for hearing on a guardianship petition filed by the Department of Social and Health Services (DSHS), State of Washington under RCW 13.34.231. Parties are Marion Ware, DSHS social worker, and her attorney, Anne O. Shaw, Assistant Attorney General; Valerie and Daniel Witt, the proposed guardians; and Barbara Hollingback, Guardian ad Litem. The natural mother, Gerri D. Akers, and stepfather, Jerry Akers, were represented by C. Ray Byrd. Having reviewed the files, and being fully informed in the premises, the court makes the following:

## FINDINGS OF FACT

1.1  The child was found to be dependent pursuant to RCW 13.34.030(2) on October 17, 1991.

1.2  A dispositional plan was entered on October 17, 1991 pursuant to RCW 13.34.130.

ORDER OF GUARDIANSHIP - 1

7

Witt
03000170

ATTORNEY GENERAL OF WASHINGTON
470 Woodland Square Loop SE
PO BOX 40124
Olympia, WA  98504-0124
(206) 459-6558

66

1    1.3   The bruises and lacerations described in the testimony

2    of Dr. Isaac Pope were the results of physical abuse.

3    1.4   The child has been removed from the custody of his

4    natural parents at least six months pursuant to a finding of

5    dependency under RCW 13.34.030(2).

6    1.5   The proposed guardians, Valerie and Daniel Witt, are

7    over twenty-one years of age, of sound mind, have not been

8    convicted of any felony or misdemeanor involving moral turpitude,

9    and are otherwise suitable guardians for the child.

10    1.6   The child has been residing in the Witt foster home with

11    the proposed guardians since February 1992.

12    1.7   The child is not a member of or eligible for membership

13    in an Indian tribe and the Indian Child Welfare Act, 25 U.S.C. §

14    1901 et seq. does not apply to the proceedings.

15    1.8   The parent is/is not a member of the Armed Forces and

16    the Soldiers and Sailors Civil Relief Act does/does not apply to

17    these proceedings.

18    1.9   Services ordered under RCW 13.34.130 have been offered

19    or provided and all necessary services reasonably available,

20    capable of correcting the parental deficiencies within the

21    foreseeable future have been offered or provided.

22    1.10  There is little likelihood that conditions will be

23    remedied so that the child can be returned to the parents in the

24    near future.

25

26

8

ORDER OF GUARDIANSHIP - 2

Witt
03000171

ATTORNEY GENERAL OF WASHINGTON
670 Woodland Square Loop SE
PO BOX 40124
Olympia, WA 98504-0124
(206) 459-6558

1  1.11 Guardianship rather than termination of the parent-child

2  relationship or continuation of the child's current dependent

3  status is in the best interest of the family.

4  ## CONCLUSIONS OF LAW

5  2.1  The court has jurisdiction over the parties and subject

6  matter of this proceeding.

7  2.2  The findings are supported by a preponderance of the

8  evidence.

9  2.3  A guardianship may be established under RCW 13.34.231.

10  2.4  Valerie and Daniel Witt are suitable and qualified

11  guardians under RCW 13.34.236.

12  ## ORDER

13  IT IS HEREBY ORDERED:

14  3.1  That the guardianship petition is granted pursuant to

15  RCW 13.34.232.

16  3.2  That Valerie and Daniel Witt are appointed guardians of

17  the above-named minor child with care, custody and control over

18  him.  This appointment is for the purpose of assisting the court

19  in the supervision of the dependency.

20  3.3  That the duration of this guardianship shall be until

21  the child attains the age of 18 years, or until further order of

22  the court.

23  3.4  That the guardians are authorized to consent to all

24  routine or necessary medical, dental or psychological treatment

25  for the child.

26

9

ORDER OF GUARDIANSHIP - 3

Witt
03000172

ATTORNEY GENERAL OF WASHINGTON
670 Woodland Square Loop SE
PO BOX 40124
Olympia, WA 98504-0124
(206) 459-6558

1    3.5  That visitation between parents and child is suspended

2  for six months on the recommendation of child's therapist.

3    3.6  That this matter be set for review in six months.

4    DATED this ___9___ day of ~~December~~ *March*, 199~~2~~3.

5

6

7                                    _____
                                     ~~JUDGE~~/COURT COMMISSIONER

8  Presented by:

9  KENNETH O. EIKENBERRY
   Attorney General

10

11

12  _____
    ANNE O. SHAW
13  Assistant Attorney General
    WSBA #12489
14  Attorneys for DSHS

15  APPROVED FOR ENTRY:

16  _____
    C. RAY BYRD
17  Attorney for Parents

18

19  _____
    BARBARA HOLLINGBACK
20  Guardian ad Litem

21

22

23

24

25

26
                                                    10

                        Witt
                        03000173

ATTORNEY GENERAL OF WASHINGTON
670 Woodland Square Loop SE
PO BOX 40124
Olympia, WA  98504-0124
(206) 459-6558

ORDER OF GUARDIANSHIP - 4

1       3.5   That visitation between parents and child is suspended

2   for six months on the recommendation of child's therapist.

3       3.6   That this matter be set for review in six months.

4       DATED this _____9_____ day of ~~December~~, 199*March* 199~~8~~3.

5

6

7   _____
    ~~JUDGE~~/COURT COMMISSIONER

8   Presented by:

9   KENNETH O. EIKENBERRY
    Attorney General

10

11

12   _____
     ANNE O. SHAW
13   Assistant Attorney General
     WSBA #12489
     Attorneys for DSHS

14

15   APPROVED FOR ENTRY:

16   _____
     C. RAY BYRD
17   Attorney for Parents

18

19   _____
     BARBARA HOLLINGBACK (By Jeannie D'Amit)
     Guardian ad Litem

20

21

22

23

24

25

26

ORDER OF GUARDIANSHIP - 4

Witt
03000174

TTORNEY GENERAL OF WASHINGTON
670 Woodland Square Loop SE
PO BOX 40124
Olympia, WA  98504-0124
(206) 459-6558

EXHIBIT B

1

2

3

4

5

6        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

7             IN AND FOR THE COUNTY OF LEWIS

8    In the Interest of:              )
                                      )  NO. 95-5-00054-1
9    R██████ J. T██████, DOB: ██████86 )
     E██████ A██████, DOB: ██████89    )  DECREE OF ADOPTION
10   T██████ A██████, DOB: ██████90    )
     B██████ A██████, DOB: ██████92    )
11   N██████ A██████, DOB: ██████93    )
                                      )
12             Minor Children.         )
     ─────────────────────────────────)

13

14        THIS MATTER has come on regularly for hearing before the

15   undersigned Judge/Court Commissioner of the above-entitled Court on

16   the petition of DANIEL WITT and VALERIE WITT, husband and wife, for

17   a decree of adoption as to the above-named minor children.   The

18   Court has previously made and entered its Findings of Fact and

19   Conclusions of Law and has full and complete jurisdiction over the

20   parties to this action and this subject matter.   The Court has also

21   determined that the Indian Child Welfare Act and the Soldiers' and

22   Sailors' Civil Relief Act of 1940 do not apply to this proceeding.

23   Being fully advised, it is hereby

24        ORDERED, ADJUDGED AND DECREED as follows:

25        1.   The consent of the Washington State Department of Social

26   and Health Services is approved.

                                              Witt
                                          03000003

DECREE OF ADOPTION                                13      TILLER, FAGERNESS & WHEELER
jsj\adoption\mw\recd.dec              Page 1              ATTORNEYS AT LAW
                                                         ROCK AND PINE - P.O. BOX 58
                                                         CENTRALIA, WASHINGTON 98531-0058
                                                         AREA CODE 206 - TELEPHONE 736-9301
                                                         TELECOPIER 206/736-6029

                                  72

1    2.  The names of the children shall be changed as follows:

2    

5    3.  The above named children are for all intents and purposes

6    and for all legal incidents the children, legal heirs, and lawful

7    issue of the Petitioners, DANIEL WITT and VALERIE WITT, and are

8    entitled to all rights and privileges, including the rights of

9    inheritance, and the right to take under testamentary disposition,

10   and subject to the obligations of natural children of an adoptive

11   parent.

12   4.  The Washington State Registrar of Vital Statistics shall

13   make a new birth certificate for each of the children in the usual

14   form pursuant to adoption information furnished by Petitioners to

15   this Department.  All records of this Department and the files in

16   the case in connection with these children are to remain sealed and

17   to be disclosed only upon an order of the above-entitled Court for

18   good cause shown.

19                       ADOPTION SUMMARY

20   1.  R▇▇▇▇ J. T▇▇▇▇▇

21       a.  Full original name of the person to be adopted:

22   R▇▇▇▇ J. T▇▇▇▇▇

23       b.  Full new name of the person adopted:  N▇▇▇▇▇▇▇

24   I▇▇▇▇ WI▇▇

25       c.  Adoptee's actual or determined date of birth:  MARCH

26   7, 1986.

Witt
03000004

DECREE OF ADOPTION
jsj\adoption\nw\reed.dec              Page 2

14

TILLER, FAGERNESS & WHEELER
ATTORNEYS AT LAW
ROCK AND PINE -- P.O. BOX 58
CENTRALIA, WASHINGTON 98531-0058
AREA CODE 206 - TELEPHONE 736-9301
TELECOPIER 206/736-6828

1          d.   Adoptee's actual or determined place of birth:

2   CENTRALIA, WASHINGTON.

3          e.   Full name of each Petitioner: DANIEL ARLEN WITT AND

4   VALERIE LYNN WITT.

5          f.   Relationship to child:  FOSTER PARENTS.

6          g.   State of Petitioners:  HUSBAND AND WIFE.

7          h.   Indian Welfare Act:  DOES NOT APPLY.

8          i.   Soldiers' and Sailors' Civil Relief Act of 1940:

9   DOES NOT APPLY.

10      2.   E█████████ A█████

11          a.   Full original name of the person to be adopted:

12   E█████████ A█████

13          b.   Full new name of the person adopted:   B███████

14   J██████ B█████ W███

15          c.   Adoptee's actual or determined date of birth:  JULY

16   23, 1989.

17          d.   Adoptee's actual or determined place of birth:

18   CENTRALIA, WASHINGTON.

19          e.   Full name of each Petitioner:  DANIEL ARLEN WITT AND

20   VALERIE LYNN WITT.

21          f.   Relationship to child:  FOSTER PARENTS.

22          g.   State of Petitioners:  HUSBAND AND WIFE.

23          h.   Indian Welfare Act:  DOES NOT APPLY.

24          i.   Soldiers' and Sailors' Civil Relief Act of 1940:

25   DOES NOT APPLY.

26      3.   T█████ A█████

74                    15

DECREE OF ADOPTION

jaj\adoption\mw\rccd.dec                Page 3

TILLER, FAGERNESS & WHEELER
ATTORNEYS AT LAW
ROCK AND PINE – P.O. BOX 58
CENTRALIA, WASHINGTON 98531-0058
AREA CODE 206 – TELEPHONE 736-9301
TELECOPIER 206/736-5828

Witt
03000005

1          a.   Full original name of the person to be adopted:

2   T█████ A█████.

3          b.   Full new name of the person adopted:   T███████

4   M███████S W███.

5          c.   Adoptee's actual or determined date of birth:

6   OCTOBER 19, 1990.

7          d.   Adoptee's actual or determined place of birth:

8   CENTRALIA, WASHINGTON.

9          e.   Full name of each Petitioner:  DANIEL ARLEN WITT AND

10  VALERIE LYNN WITT.

11         f.   Relationship to child:  FOSTER PARENTS.

12         g.   State of Petitioners:  HUSBAND AND WIFE.

13         h.   Indian Welfare Act:  DOES NOT APPLY.

14         i.   Soldiers' and Sailors' Civil Relief Act of 1940:

15  DOES NOT APPLY.

16     4.   B██████ A█████.

17         a.   Full original name of the person to be adopted:

18  B███████ A█████.

19         b.   Full new name of the person adopted:  B███████ J██████

20  W████.

21         c.   Adoptee's actual or determined date of birth:  MARCH

22  27, 1992.

23         d.   Adoptee's actual or determined place of birth:

24  CENTRALIA, WASHINGTON.

25         e.   Full name of each Petitioner:  DANIEL ARLEN WITT AND

26  VALERIE LYNN WITT.

75

16

TILLER, FAGERNESS & WHEELER
ATTORNEYS AT LAW
ROCK AND PINE – P.O. BOX 58
CENTRALIA, WASHINGTON 98531-0058
AREA CODE 208 · TELEPHONE 736-9301
TELECOPIER 206/736-5828

1        f.    Relationship to child:  FOSTER PARENTS.

2        g.    State of Petitioners:  HUSBAND AND WIFE.

3        h.    Indian Welfare Act:  DOES NOT APPLY.

4        i.    Soldiers' and Sailors' Civil Relief Act of 1940:

5  DOES NOT APPLY.

6     5.    N██████ A██████

7        a.    Full original name of the person to be adopted:

8  N██████ A██████

9        b.    Full new name of the person adopted:  B████████ I████

10  W████

11        c.    Adoptee's actual or determined date of birth:  JULY

12  15, 1993.

13        d.    Adoptee's actual or determined place of birth:

14  CENTRALIA, WASHINGTON.

15        e.    Full name of each Petitioner:  DANIEL ARLEN WITT AND

16  VALERIE LYNN WITT.

17        f.    Relationship to child:  FOSTER PARENTS.

18        g.    State of Petitioners:  HUSBAND AND WIFE.

19        h.    Indian Welfare Act:  DOES NOT APPLY.

20        i.    Soldiers' and Sailors' Civil Relief Act of 1940:

21  DOES NOT APPLY.

22     DONE IN OPEN COURT this _____ day of _____,

23  1995.

24                          Original Signed By
                                 H. JOHN HALL

25                                   J U D G E

26  . . .

76

DECREE OF ADOPTION

jaj\adoption\nnw\reed.doc

Page 5

Witt
03000007

TILLER, FAGERNESS & WHEELER
ATTORNEYS AT LAW
ROCK AND PINE – P.O. BOX 58
CENTRALIA, WASHINGTON 98531-0058
AREA CODE 206 · TELEPHONE 736-9301
TELECOPIER 206/736-6828

1   Presented by:

2   TILLER, FAGERNESS & WHEELER

3

4   _____
    PETER B. TILLER - WSBA NO. 20835
5   Of Attorneys for Petitioners

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

18                          77

DECREE OF ADOPTION                          Witt        LER, FAGERNESS & WHEELER
jsj\adoption\msw\recd.dcc    Page 6        03000008      ATTORNEYS AT LAW
                                                         ROCK AND PINE - P.O. BOX.58
                                                         CENTRALIA, WASHINGTON 98531-0058
                                                         AREA CODE 206 - TELEPHONE 736-9301
                                                         TELECOPIER 206/736-5828

EXHIBIT C



Washington State
DEPARTMENT OF
SOCIAL & HEALTH
SERVICES

DIVISION OF CHILDREN AND FAMILY SERVICES (DCFS)
**VOLUNTARY PLACEMENT AGREEMENT**

This is an agreement between the ___CENTRALIA    DCFS___
                                                            NAME OF LOCAL OFFICE
of the Division of Children and Family Services (DCFS) and the parent/custodians regarding

| CHILD'S NAME (FIRST, MIDDLE, LAST) | DATE OF BIRTH | SOCIAL SECURITY NUMBER |
|---|---|---|
| NATHAN I WITT | 3/7/86 | |

**PARENT AGREES:**

I voluntarily agree that the above-named child (or client over 18) be placed in the care and under the supervision of DCFS. I authorize DCFS to carry out the duties and responsibilities as described later in this agreement. DCFS is further authorized to apply as a representative payee for any benefits the child is eligible to receive, and to use the funds to cover the cost of care and services provided to the child.

I understand that this agreement may end upon my written request. I also agree and understand that the child shall be returned to me within 72 hours after DCFS receives the written request unless a court order authorizing out-of-home placement has previously been entered, or unless the child has been placed in protective custody by law enforcemeent.

I retain the authority to authorize non-emergency surgery; consent to marriage; enlistment in the armed forces; and to make other important legal decision for the child. I agree to the following responsibilties:

1. To keep DCFS informed of my current address;
2. To participate with DCFS in making decisions for the child;
3. To work cooperatively with DCFS staff and the persons caring for the child;
4. To maintain personal contacts with the child;
5. To provide appropriate medical, social, and school information to insure proper care of the child; and
6. To cooperate with the Office of Support Enforcement (OSE) in determining the amount of support I will pay, and to pay support consistent with any agreement made with OSE or as set by administrative or court order. This is required under Washington State Law.

**DCFS AGREES:**

1. To place the child/client in a home or facility licensed or certified by the state;
2. To develop with you an individual service plan for the child/client, and to offer appropriate and reasonably available services;
3. To help you maintain your rights and responsibilities as a parent, and to work towards returning the child to your care;
4. To have physical custody and control of the child/client;
5. To supply the child/client with food, clothing, shelter, and incidental necessities, and provided education and guidance;
6. To authorize routine medical, dental , psychiatric, and psychological care for the child and emergency care when the child's safety requires;
7. To place the child in a culturally relevant home or facility, if possible; and
8. To keep you informed of child's placement.

**LIMITATIONS OF THIS AGREEMENT:**

1. DCFS may end this agreement at any time with written notice to the parent, or commencing of a court proceeding;

2. This agreement begins ___7/11/96___ and ends by ___7/15/96___
                              BEGINNING DATE                    ENDING DATE

**ENDING DATE MUST BE WITHIN 180 DAYS OF BEGINNING DATE.**

| SIGNATURE OF PARENT | DATE |
|---|---|
| X _Valerie L. Witt_ | 7-11-96 |
| SIGNATURE OF PARENT | DATE |

| SIGNATURE OF CLIENT OVER AGE 18 | DATE |
|---|---|

| SIGNATURE OF DCFS SERVICE WORKER/WITNESS | Witt | DATE |
|---|---|---|
| _Tori Price_ | 01000144 | 7/11/96 |

I, ___VALERIE   WITT___, certify under penalty of perjury that the following is true and correct that I have legal custody of the child, or the child resides with me a majority of the time as specified in a parenting plan, or I have the authority pursuant to a parenting plan to consent to this agreement.

X _Valerie L. Witt_                on ___7/11/96___ at ___RESIDENCE___
        SIGNATURE OF PARENT                              DATE                      LOCATION

DSHS 09-004B(X) (REV. 08/94)  TRANSLATED          **DISTRIBUTION:** White - Record     Yellow - Parents

EXHIBIT D

SUPERIOR COURT OF WASHINGTON
FOR LEWIS COUNTY

In re the Dependency of:

Nathan Witt

DOB:  3/7/86

       Minor Child(ren).

NO.  97-7-218-1

FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER OF ⊠
DEPENDENCY/ ⊠ DISPOSITION
[ ] DENIAL OF DEPENDENCY
PETITION

    THIS MATTER came before the Court __8__ / __28__ / __97__ for a
⊠ dependency fact-finding / ⊠ disposition hearing pursuant
to chapter 13.34 RCW.  The Court makes the following:

## I.  FINDINGS OF FACT

1.1  Present at the hearing were:

    [ ] Child             ⊠ Child's GAL
    [ ] Mother           ⊠ Mother's Attorney
    [ ] Father            ⊠ Father's Attorney
    ⊠ Social Worker    ⊠ Assistant Attorney General
    [ ] _____    [ ] _____

1.2  ⊠  Notice was given in accordance with RCW 13.34.070 or
13.34.080 to the ⊠ mother / ⊠ father / [ ] legal
guardian / custodian.

1.3  [ ]  An unrepresented indigent [ ] mother / [ ] father
appeared in court and knowingly waived the right to court-
appointed counsel pursuant to RCW 13.34.090.

1.4  [ ]  The child meets none of the dependency criteria under
RCW 13.34.030(4).

    ⊠  The child meets the following dependency criteria
under RCW 13.34.030(4):

a.  [ ]  The child has been abandoned.  That is, the
      child's parent, guardian or other custodian has shown by
      statement or conduct an intention to forego, for an
      extended period, all parental rights or
      responsibilities, despite an ability to do so;

FINDINGS, CONCLUSIONS AND -
ORDER OF DEPENDENCY :

(JUV-111L.WP/rev.7/97)

22

Attachment B

b.   [  ]   The child is abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child;

c.   [X]   The child has no parent, guardian or custodian capable of adequately caring for the child such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development;

1.5     This finding is based on the following facts:

[X]   as alleged in the dependency petition; and
[  ]   _____
_____
_____
_____
_____
_____

1.6   [X]   The dependency petition was filed on  *7/3/97*

1.7   [X]   The child was removed from the parent's custody on *7/96 on a Voluntary Placement Agreement, 7/10/97 pursuant to a shelter care order.*

1.8   [  ]   The child should be placed or remain in the parent's home.

1.9   [X]   It is contrary to the child's best welfare to return home.   Reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home. The following services have been offered or provided to the child and the child's parent, guardian or custodian:

[X]   as set out in predispositional report; and/or
[  ]   _____
_____
_____
_____
_____
_____

The child should be placed or remain out of home because:

[  ]   There is no parent or guardian available to care for the child;
[X]   The parent or guardian is unwilling to take custody of the child;

FINDINGS, CONCLUSIONS AND - 2          23
ORDER OF DEPENDENCY :

(JUV-111L.WP/rev.7/97)

ORNEY GENERAL OF WASHINGTON
670 Woodland Square Loop SE
PO BOX 40124
Olympia, WA  98504-0124
(360) 459-6558

1       ▷◁   A manifest danger exists that the child will
suffer serious abuse or neglect if the child is not
2       removed from the home and an order under RCW 26.44.063
will not protect the child from danger;

3

1.10    The child should be placed or remain in:
4
        [  ]   relative placement; or
5       ▷◁   licensed care, [  ] pending completion of agency
        investigation   of   relative   placement   resources;
6       ▷◁ because there is not a relative willing and
        available to care for the child with whom the child has
7       a relationship and is comfortable; [  ] because there
        is reasonable cause to believe that relative placement
8       would jeopardize the safety or welfare of the child
        and/or hinder efforts to reunite the parent and the
9       child.

10      1.11   ▷◁   DSHS has set forth a specific plan in accordance with
        RCW 13.34.130.
11
        1.12  [  ]   The child has been removed from home pursuant to RCW
12      13.34.130(1)(b) and the supervising agency has recommended
        that a petition be filed seeking termination of the parent-
13      child relationship between the child's [  ] mother [  ]
        father and the child.  Filing of a termination petition is in
14      the child's best interests.  It is not reasonable to provide
        further services to reunite the family because the existence
15      of aggravated circumstances make it unlikely that services
        will effectuate the return of the child to the parent in the
16      near future.  In determining whether aggravated circumstances
        exist, the Court has considered one or more of the factors
17      set forth in RCW 13.34.130(2).

18      1.13   ▷◁   The child is not an Indian child as defined by 25
        U.S.C. § 1903(4).
19      [  ]   The child is an Indian child as defined by 25 U.S.C.
        § 1903(4).
20               [  ]   Notice to the Indian tribe has been given in
        accordance with RCW 13.34.070(9).
21               [  ]   Based upon clear, cogent and convincing evidence,
        including the testimony of a qualified expert witness,
22      continued custody of the child by the [  ] mother
        [  ] father [  ] Indian custodian is likely to result
23      in serious physical or emotional harm to the child.
                 [  ]   Active efforts have been made to provide remedial
24      services and rehabilitative programs designed to prevent
        the break-up of the Indian family, but these efforts
25      have been unsuccessful.
        [  ]   It is not determined whether the child is an Indian
26      child as defined by 25 U.S.C. § 1903(4).

                                                        24

FINDINGS, CONCLUSIONS AND - 3
ORDER OF DEPENDENCY  :

ATTORNEY GENERAL OF WASHINGTON
670 Woodland Square Loop SE
PO BOX 40124
Olympia, WA  98504-0124
(360) 459-6558

(JUV-111L.WP/rev.7/97)                    11

1.14 _____

_____

_____

_____

_____

1.15  As to the mother, entry of this order was [   ] contested / [✗] uncontested / [   ] by default.  As to father, entry of this order was [   ] contested / [✗] uncontested / [   ] by default.

## II.   CONCLUSIONS OF LAW

2.1  The Court has jurisdiction over the child, [✗] mother, [✗] father, [   ] legal guardian/custodian, and the subject matter of this action.

2.2  [   ]  The child is not dependent and the matter should be dismissed:

[✗]  The child is dependent pursuant to RCW 13.34.030(4) [   ] (a), [   ] (b), [✗] (c).

2.3  [✗]  A dispositional order may be entered pursuant to RCW 13.34.130.

2.4  The foregoing Findings of Fact have been established by a preponderance of the evidence.

2.5  [✗]  The necessity of out-of-home placement has been established by clear, cogent, and convincing evidence.

2.6  The [✗] mother; [✗] father; and/or [   ] guardian have received timely and proper notice.

## III.   ORDER

IT IS HEREBY ORDERED:

3.1  [   ]  The child is not dependent and the matter is dismissed.

[✗]  The child is dependent.

25

FINDINGS, CONCLUSIONS AND - 4
ORDER OF DEPENDENCY

(JUV-111L.WP/rev.7/97)                         12

ATTORNEY GENERAL OF WASHINGTON
670 Woodland Square Loop SE
PO BOX 40124
Olympia, WA  98504-0124
(360) 459-6558

3.2   [   ]   The child shall be placed or remain in the home of the [   ] parents, [   ] mother, [   ] father, or [   ] guardian.

~~[✗]~~ The child shall be placed out of home with:
   [   ] _____, a relative;
   ~~[✗]~~ the Department of Social and Health Services in a licensed foster home or group care facility;
   ~~[✗]~~ a licensed child-placing agency; or
   ~~[✗]~~ the necessity for out-of-home placement was established by clear, cogent, and convincing evidence.

3.3   The person or agency having custody of the child shall have full authority to consent to all necessary medical, dental, or psychological care for the child.

3.4   ~~[✗]~~ The recommendations in the predispositional report filed by the Department of Social and Health Services pursuant to RCW 13.34.130 are adopted, and incorporated herein,
   [   ]   with the following amendments: _____
_____
_____
_____.

3.5   [   ]   A termination petition shall be filed under RCW 13.34.

3.6   All service providers shall make reports available to DSHS and to the Guardian ad Litems.   Parents shall sign releases of information to allow all service providers to make reports available to the Department of Social and Health Services and the Guardian ad Litems.

3.7   Pursuant to RCW 13.34.130(3)(b)i, all requirements under the Individual Service Plan (ISP) shall be completed by the ~~[✗]~~ mother ~~[✗]~~ father within:   _____ 6 months _____.

3.8   [   ]   The natural mother, _____, shall cooperate with the state in establishing the natural father of the child/ren.  This cooperation shall include, but not be limited to, appearing for any appointment scheduled with the Lewis County Prosecutor's Office, executing necessary documents, and submitting to blood tests if necessary.   Failure to assist in the establishment of the child/ren's father may result in finding the mother in contempt of court.

3.9   THE CHILD WILL Remain iN his Current foster home placemeNT unless and until it is no longer PRACTICABLE, iN WHICH case the child shall be placed AT THE MARTIN CENTER iN BelliNg ham. THE Child shall not be placed iN any other foster care placement other than the MARTIN CENTER iN BelliNgham without further Order of the Court

FINDINGS, CONCLUSIONS AND - 5
ORDER OF DEPENDENCY  :

(JUV-111L.WP/rev.7/9`

ATTORNEY GENERAL OF WASHINGTON
670 Woodland Square Loop SE
PO BOX 40124
Olympia, WA  98504-0124
(360) 459-6558

13

THIS ADOPTIVE PARENTS of the depend. - child shall continue to have liberal visitation and to have a part or voice in placement, treatment, and visitation. Should the department wish to modify the foregoing provision, it shall be required to do so by application to the Court.

1   In conformity with prior practice, Adoption Support shall
2   continue to pay for the costs of this child's placement. The
    State of Washington shall NOT seek recovery of placement costs
3   from Daniel and Valerie Witt, the adoptive parents.

4   3.10 [  ]  This Order is by default as to the [  ] mother /
5        [  ]  father who failed to appear at the hearing.

5   3.11 FAILURE BY A PARTY TO COMPLY WITH THIS ORDER MAY RESULT IN A
6        MOTION AND ORDER OF CONTEMPT PURSUANT TO RCW 13.34.165.

7        DATED this 28 day of August, 19 97.

8

9

10                                            _____
                                              JUDGE/COMMISSIONER

11  Presented by:

12  CHRISTINE O. GREGOIRE
    Attorney General

13

14  By _Mareen Bartlett_____

15  _Mareen Bartlett_____, WSBA # 25271
    Assistant Attorney General

16

17

18  APPROVED FOR ENTRY; NOTICE
    OF PRESENTATION WAIVED:

19
    _Valerie L. Witt_____    _____
20  Mother                         Mother's Attorney, WSBA # 12519

21
                                   _____
22  Father                         Father's Attorney, WSBA # 12519

23
    _Barbara Hollingback_____    _____
24  ~~Attorney~~ Guardian ad Litem    Volunteer Guardian ad Litem

25

26

                                    27

FINDINGS, CONCLUSIONS AND - 6
ORDER OF DEPENDENCY :

(JUV-111L.WP/rev.7/97)            ATTORNEY GENERAL OF WASHINGTON
                                          670 Woodland Square Loop SE
                                          PO BOX 40124
                                          Olympia, WA  98504-0124
                                          (360) 459-6558

EXHIBIT E

**CASE NARRATIVE**

Child's Name  Nathan Witt _____
Date  4/20/99 _____

_____   **INITIAL TREATMENT PLAN**

_____   **INTERIM REVIEW**

__X__   **CLOSING (SUMMARY AND RECOMMENDATIONS)**


**CLOSING NARRATIVE:**   Nathan was in care at CHS for almost 2.5 years.  When Nathan first entered care, he was experiencing weekly crisis, was unable to follow simple instructions, expressed a severe mistrust for adults, and showed patterns of repeated running away, stealing, lying, and being aggressive and out-of-control.  This behavior lasted for about six months until Nathan was hospitalized at Children's Hospital in Seattle.  He got worse at Children's and the team decided to bring him back to the foster home and wrap services around the needs and strengths. This seemed to work for Nathan because we began to see dramatic improvements.


Nathan showed that he could follow simple directions, stopped stealing, decreased crisis to one every 2-3 months, and stopped running away.  Nathan progressed in therapy and began to show a level of trust not seen before this time.  He opened up and began to share about his history and his feelings about past abuse. Nathan's progress continued until his foster family went into their own crisis and this had a huge impact on Nathan.   In December of 1998, he was again hospitalized but was stable in less than two weeks.   At this time, the foster home could no longer care for Nathan and placement was arranged with Morrison Center in Portland and Nathan was placed in a home that specifically asked to care for him and was licensed to meet this need.   This family already knew Nathan as he was receiving respite from some of their family members.   This family was willing to make a long term commitment for Nathan.


The decision was made to place Nathan there as this writer and others had been trying to advocate for Nathan to have a permanent plan.  We all really wanted Nathan to be placed closer to his adoptive family because he still needed to be able to address family issues with a family that was very important to him.  But, this did not seem to be an option and we were needing to place Nathan.   We explored options closer to family but there was nothing available.

Witt
02000606

Nathan was being successful in the new placement and a special school program was identified. Throughout Nathan's treatment school has been a very difficult and special need. Nathan has had little formal schooling in his life and show very poor social skills. In addition, the behavioral concerns require a day-treatment type setting. Some team members have felt Nathan needed more intense residential treatment but, Nathan's record shows he decompensates in residential settings and can be very successful in the right family setting.

Nathan left our program abruptly without this writer being notified. It seems the support system in Centralia did not approve of the placement and wanted him moved. They had never met the family Nathan was currently living with but still wanted him moved. The team in Vancouver was not notified of the move and this was very upsetting to Nathan. This was a loss to Nathan and those of us who have worked with him so closely for so many years. Nathan showed great progress from when he first entered care.

Family involvement has been difficult in this case due to distance and what seemed a lack of support for change. Nathan's support system in Centralia rarely came to Vancouver to visit him and was not able to maintain regular contact. Attempts to develop plans and create options always seemed to fail. In addition, his support system seemed unable to see Nathan's progress or understand that some of his needs were going to be lifelong and were due to the alcohol-exposed diagnosis and not something Nathan could control. Distance made this case difficult and this writer started advocating for a closer placement in September of 1998. It is our hope that Nathan is successful in his new placement and is able to address the family issues and some form of family treatment is initiated. The couple of visits Nathan had with his family, as observed by this writer, showed great potential for success. Nathan's adoptive family is devoted to him but need to recognize that he has changed and no longer needs to be the problem in the family. Nathan's siblings were very reactive toward him and often blamed him for an interaction while wrestling that Nathan was not even involved in.

It seems clear that Nathan's needs are great and the system has responded in the best way possible, sometimes without success. Nathan's needs are complex and may not be able to be met without long-term planning and intense services. It is our hope that the new providers can provide this level of care for Nathan. However, no one has talked with any of the providers in Vancouver to date so we cannot be sure of Nathan's plan. In addition, medication management was being provided by this agency and no transition planning took place. Team was not in full agreement of the plan but many team members did not seem to have a voice.

Witt
02000607

Many team members felt Nathan could do well in a foster home with the right training and supports. The home he was in had no other children and Morrison Center was able to provide lots of support and training. Team seemed to fall apart in the final months of Nathan's care. It is our hope that the new team can support Nathan and ✕ iron out✕ the family issues.

UPDATE 10/98: The following narrative is correct and complete at this time. Team's primary focus is to begin to develop a long-term plan for Nathan so as to not disrupt his progress in treatment and to meet his long term need for intensive care. Team is not sure what it will look like but is just beginning to explore options. Nathan showed success when there was a respite need for the Michaelis and he stayed with a Morrison Center Proctor home for two weeks. During that stay, Nathan was not alarmed in his room, was an only child, and had daily access to a 4 foot swimming pool. There were no reports of problems or incidents in that home. In therapy, Nathan is becoming more and more expressive with work branching out into the sand tray and other play forms. He shows weekly themes of protection and strength. Nathan is following directions better, responds to limits with less opposition, and is doing well in school. The team is torn between what Nathan shows he can do and the problems he still has from time to time. Nathan still requires intense supervision which can be draining to a family. Goals and objectives remain the same at this time and long term needs are being addressed.

Previous narratives 8/97, 1/98: Nathan entered our therapeutic foster care program in October, 1996. Nathan was placed with Steve and Donna Michaelis, who have been foster parents with CHS for 5+ years. The Michaelis' specialty and expertise is with developmentally delayed and behaviorally disturbed children. A wraparound team was immediately formed for Nathan and treatment issues addressed.

Nathan is a very challenging child who has suffered from years of severe abuse and neglect. Nathan presented with signs of PTSD as well as alcohol exposed problems. His anger and defiance were out-of-control and his adoptive family could no longer meet his needs in addition to the other children in the home. In Nathan's first 6 months of placement, there were repeated episodes of destructive behavior, rage responses, running away, placing himself in dangerous situations, and some assaultive behavior. It was clear that Nathan required 24 hour supervision with a strict behavioral program in place.

In April 1997, the team chose to temporarily hospitalize Nathan due to his danger to himself and increased defiance and acting out. Nathan was placed at Children's Hospital in Seattle for stabilization. However, during this stay, Nathan's acting out and defiance increased and it became apparent that this setting

Witt
02000608

was not helping Nathan.   The team chose to remove him at the end of May.   The hospital's recommendation was for inpatient residential treatment and the team agreed that this may be the direction we would need to go.   It was agreed to begin to file for a CLIP (Children's long-term inpatient program) referral and alternative placements were discussed.

However, at this point, Nathan has begun to show signs of stabilization and a CLIP referral was not needed nor filed. Nathan's plan includes 24 hour supervision, individual treatment sessions, team planning, medication management, crisis intervention in the home, and a highly structured behavioral plan in the home.   The Michaelis are responding to Nathan consistently with as little emotion as possible.   The team approved and is paying Nathan's foster brother to provide 20 hours a week of in-home interventions as per the hospital's recommendation for a crisis plan to include giving Nathan a chance to calm down on his own.   This helper also assists Nathan during morning and bedtime routines, takes him on public outings, and acts as a mentor for Nathan.   So far, this seems to be working.

Nathan continues to show progress in the home and generally remains stable.   The Michaelis family still maintains heavy levels of supervision and cannot let Nathan out of sight. However, Nathan has decreased his negative response to directions, numbers of restraining sessions, numbers of temper tantrums, frequency of stealing and lying, and assaultiveness in the home.

School is the current challenge for Nathan.   Nathan increased defiant behaviors at school which has led to placement in a special education day treatment program for behaviorally disordered children.   It is the team's hope that this program will be able to meet Nathan's need for structure or limits.   This program also includes a mental health component which is seen as critical for Nathan as much of his defiance is connected to emotional stress and trauma.

In therapy, Nathan has begun to show progress.   He is beginning to talk about his family both adoptive and biological.   Nathan is using art to express his feelings and is developing some use of problem-solving skills.   Nathan, as well, is showing emotion in the therapy session from time to time and seems to feel safe in this setting.   It is hoped that Nathan will continue to grow in this process now that he has begun to feel safe.   There is still lots of work to do.

Nathan continues to struggle with transitions, shows many deficits in staying on task, and shows a great deal of emotional stress.   Nathan is beginning to verbalize that living in Centralia is a problem for him as it holds lot of bad memories. The team requested in October, that Nathan's family call every Sunday evening as contact is important to Nathan.   This happens sporadically and often on other nights of the week when Nathan is

Witt
02000609

already asleep.  Valerie and Dan did come down at Christmas time for an overnight in a motel.  By all reports, this visit went well.  We would like to see more consistent contact.

At this time the recommendation is for at least nine more months of treatment to see if Nathan can stabilize in a school program and begin to internalize the program at home.  Nathan is responding to limits but seems to still need constant supervision.  As well, having begun to use the therapy session, perhaps we will begin to see Nathan internalize the structure. The team will address long term planning as a goal this review period.  Family commitment also needs to be addressed and established more firmly.  Team would like to try to use a Behavioral Skills Specialist again and decrease hours of in-home work.

Therapist Signature _____ Edie John MSW _____

2/14/96

**CHILD AND FAMILY MENTAL HEALTH SPECIALIST**

Witt
02000610

EXHIBIT F



**MORRISON CENTER**
**CHILD & FAMILY SERVICES**

RECEIVED
APR 05 1999
CENTRALIA DCFS

March 30, 1999

James Reddick
Division of Child & Family Services
P.O. Box 839
Centralia, WA 98531

Re: Nathan Witt          DOB: 03/07/86

Dear Mr. Reddick:

I am writing you to express our grave concern regarding the untherapeutic nature in which Nathan was removed from Ted and Pat Birrer's Treatment Foster Home on March 26, 1999.

I had first become aware of Nathan Witt on February 2, 1999 when my supervisor, Monica Ford, told me there was going to be an intake meeting on February 10 for Nathan. He was going to be placed in a Treatment Foster Care home through Morrison Center.

The intake meeting was held at Children's Home Society on February 10th and the following people were present: Terry Hirni, Director of Treatment Foster Care at Children's Home Society; Edie Johnson, Nathan's Therapist at Children's Home Society; Steve and Donna Michaelis, current CHS foster parents; Ted and Pat Birrer, Morrison Center Treatment Foster parents; Julie Kates, Treatment Foster Care Coordinator at Edgefield Children's Center and myself, Coordinator of Treatment Foster Care at Morrison Center. In addition, we had a conference call with Julia Stewart, DCFS worker, to discuss the plan to have Nathan be moved into the Birrer's home with Children's Home Society contracting this move with Morrison Center. Julia was aware that Morrison Center was in Portland, Oregon and that the Birrer's live in Milwaukie, a suburb of Portland. During the conference call, she made no comment about there being any concern with Children's Home Society contracting with Morrison Center, that Morrison Center was located out of the State of Washington or that Nathan would be living out of the State of Washington. Furthermore, Children's Home Society believed that Nate would benefit therapeutically in a Treatment Foster home with no other children. The Birrer's do not have any other children living in their home. The Birrer's have had the opportunity to work with severely disturbed children, because their own grown children are "Proctor" parents through the Morrison Center and the Birrer's have provided respite for these children. Lastly, Nathan knew Ted and Pat because one of their sons provided respite for Nathan for a short time and Nathan had the opportunity to meet Ted and Pat.

During the intake meeting, we discussed Nathan's current and past mental health issues, which included Fetal Alcohol Syndrome, educational issues, relationship issues with peers and adults, family history and sexually reactive behavior. In the meeting it was decided that Edie Johnson would continue weekly with Nathan's individual therapy and Dr. White would continue the medication management. There was a question of whether or not the Birrer's could use Nathan's medical card in Oregon and Terry Hirni was going to check into this possibility.

HAND IN HAND
EARLY CHILDHOOD SERVICES

HAND IN HAND
PARENT PROGRAM

(EI PROGRAM)

Witt
02000773

Page 2

Prior to the intake meeting, it was decided that Nate would move into the Birrer's home on February 10th; however, in the meeting, it was decided that he should move in on February 12th so he could have an appropriate goodbye at his school (Firgrove). Unfortunately, Nate was only able to spend ½ day at Firgrove. The school reported that since he lived in Oregon, he couldn't attend the school except for ½ day on February 11th. He was able to say goodbye to his classmates and teachers.

Julie Kates had contacted North Clackamas School District on February 10th after the intake meeting, to let the district know about Nathan being in their district. Many calls and conversations occurred between Julie Kates and Damian Coen, North Clackamas School District Psychologist, regarding Nate's unique educational needs and getting an appropriate school placement for him. On February 19th, Damian Coen, Ann Goldberg (another school psychologist), Nathan, Ted Birrer and myself met at North Clackamas' request so they could meet Nathan in person and to further assess what would be the best placement for Nathan's educational/emotional needs.

I began to have weekly supervision with the Birrer's on February 11th, the day prior to Nathan moving into their home. I had met weekly with them throughout Nathan's stay in their home and they also attended a weekly support group with other Treatment Foster parents. The Birrers reported that Nathan made a positive adjustment to their home and "settled in well."

Pat and Ted shared with me during one of our weekly supervision meetings, that the Guardian Ad Litem, Barbara Hollingback, called them and "screamed and yelled" (Pat Birrer's report) that they were not aware that Nate had moved into the Birrer home. The Birrers reported that Nate had "many severe problems." However, Ms. Hollingback implied that Nathan was a sexual offender. Ted and Pat were aware of Nate's sexually reactive behavior, but were not aware of any problems with respect to the terminology that that Ms. Hollingback used.

Additionally, Ted mentioned that Nate's adoptive father, Dan Witt, called their home on several occasions after Ms. Hollingback had called them. Ted and Pat were in favor of these calls, but found it interesting that the adoptive father never wanted to talk with them regarding their impressions of how Nathan was doing in their home or how he was doing in general. One of the phone calls lasted approximately 1 ½ hours, shortly after Nate's 13th birthday. The Birrer's were concerned about the length of the call but allowed Nate to talk anyway.

Nate began at Serendipity School in the Pace Program on March 17th. This is a highly specialized program, which would have met Nate's educational needs. He attended school for 3 days prior to Spring Break, and being abruptly removed from the Birrer's home. The school psychologist from North Clackamas School District had the opportunity to make an observation of Nate at school. It appeared (according to the psychologist) that Nate had fit well into his classroom.

Page 3

There were 9 other boys in the class that were Nate's same size and, while observing him playing basketball with his classmates, Nathan seemed to be doing so without any problems and had a smile on his face. The placement to The Pace Program at Serendipity School required a great deal of effort on the part of North Clackamas School District, Serendipity School staff, the Treatment Foster Care staff at Edgefield and Morrison Center and the Birrers. It is very concerning that these great efforts were made to have this be a positive educational placement for Nate, yet he didn't have the opportunity to befit from this program nor to have closure, which is concerning therapeutically due to his attachment issues, education, emotional and social needs.

As mentioned previously, Nate appeared to be doing very well in the Birrer's home. He began to show physical affection towards Ted by cuddling up with him when he wanted to be comforted. The Birrer's reported that Nate became very angry one day, but was able to voice his anger and then settle down, then approached Ted and Pat to say he was sorry. It was reported in the previous foster home that Nate acted out his anger in aggressive ways. This did not happen at all in the Birrer's home.

I had spoken with the Birrer's about medication and getting Nate's prescriptions filled. This was problematic because when Ted presented the medical card, the pharmacy said they could not fill the prescriptions. Calls were made to Children's Home Society by the Birrer's and the pharmacy to get this situation corrected. I spoke to Edie Johnson regarding this matter and regarding my impression of how things were going with Nate in the Birrer's home.

On March 22nd Edie called me reporting that Julia Stewart, the DCFS worker, called her stating that Nate's adoptive parents were concerned about him being in the Birrer's home. Edie reported that if the adoptive parents continue to give DCFS difficulty regarding this issue, the DCFS would have to remove Nate from the Birrer's home.

Edie also mentioned that she needed to cancel Nate's appointment this week. I had asked if there were weekly therapy appointments as we had agreed on in the intake meeting on February 10th. She said "no." I shared that I thought it would be beneficial for him to have weekly therapy as we had already agreed on. I also mentioned that the Birrer's were having difficulty getting prescriptions filled and they only had a few days left if medication on two of his four types of medication. I told Edie I would call Julia Stewart, the caseworker, to give her feedback regarding Nathan and how he was doing in the Morrison Center's Treatment Foster Program.

I had tried to call Julie on March 22nd, 23rd, and the 24th and left voice mail messages. Additionally, Julie Kates also left a voice mail to request a conference with all involved parties regarding Nate to proactively address the concerns of his adoptive parents and Ms. Hollingback. It was the desire of the Morrison Center's program to work cooperatively with all parties in order to ensure that Nate's mental health needs were being appropriately addressed and served.

Witt
02000775

Page 4

Julia Stewart left me a voice mail on March 24th after 5pm. She said that I could try to reach her on Thursday, but she would be in and out of court and difficult to reach. She said that Nate's "adoptive parents wanted him assessed." Julia said her "supervisor and higher-up manager" said that Nate would have to be assessed. Julia shared that she had just had the opportunity to talk with Ted Birrer. She said there was some "confusion" and Ted was "getting information from different sources". Julia stated that "it sounds like Nate is doing well at the Birrer's, contrary to what I heard from the adoptive parents and Ms. Hollingback." Julia said that she would like to talk with me regarding Nathan and how he was doing.

-       I was unable to reach Julia Stewart, and Julie Kates (Edgefield Treatment Foster Coordinator) had tried to call her on Thurs, March 25th. On Friday morning, March 26th, Morrison Center was informed that Nathan was going to be removed from the Birrer's home that morning. We have grave concerns about the process in which this took place and the detrimental impact this will have on Nate. Ted reported that Nate was crying and confused when he was told he was going to be removed from their home that morning. Nate asked if he could come back and live with the Birrer's.

        It is such a shame for Nate that he was removed so abruptly, especially when he was making progress in his Treatment Foster home and his school placement appeared like it would have been greatly beneficial to him. We are all confused and wonder how this move was in Nate's best interest.

Sincerely,

*Sue Billet, LCSW*

Sue Billet, LCSW
Treatment Foster Care Coordinator

cc:     Julia Stewart, DCFS Worker-Centralia
        Barbara Hollingback, Guardian Ad Litem
        Juvenile Court-Centralia, Guardian Ad Litem Supervisor
        Terry Hirni-Children's Home Society, Vancouver
        Julie Kates, Edgefield Children's Center
        Damian Coen, North Clackamas S.D. Psychologist
        Christine – Serendipity School, Lower Pace Program
        Ted and Pat Birrer, Treatment Foster parents